LA SALLE NATIONAL BANK, as Trustee, Plaintiff-Appellant, *v.* THE CITY OF CHICAGO, Defendant-Appellee.

(No. 54011; ▮▮▮▮▮▮)

First District—March 2, 1972.

Ash, Anos and Harris, of Chicago, (Joseph Ash, of counsel,) for appellant.

Richard L. Curry, Corporation Counsel, of Chicago, (Marvin E. Aspen and Richard F. Friedman, Assistants Corporation Counsel, of counsel,) for appellee.

Mr. JUSTICE McNAMARA delivered the opinion of the court:

Plaintiff brought this action for a mandatory injunction against defendant to enjoin the enforcement of a zoning ordinance against certain real estate owned by plaintiff. The case was referred to a master-in-chancery who, after hearing testimony and argument, issued a report recommending that a decree be entered according to the prayer of plaintiff's complaint. Defendant filed exceptions to the master's report. Subsequently the judge overruled the recommendations of the master and entered a decree in favor of defendant, holding that the zoning ordinance as applied to plaintiff's property was legal, valid and enforceable. On appeal plaintiff contends that the ordinance of the City of Chicago as applied to the subject property is unconstitutional.

The beneficial owner of the property acquired title in 1958. At that time the property was part of the unincorporated area of Cook County and was zoned F for farming. The 1960 comprehensive amendment to the County zoning ordinance changed the zoning of the property to R-5, multiple-family dwellings. The property was annexed to Chicago later in 1960, and the zoning was changed to R-1, single-family dwellings. That classification would permit two single-family dwellings to be built on the presently vacant land. A house and stable had stood on the land, but were torn down in 1966. By this suit, plaintiff sought to attain an R-4 zoning, under which it wished to build a 17-unit two-story apartment building with 17 parking spaces.

This property is located at 4505 North Cumberland Avenue in the City of Chicago. It has 100 feet of frontage on Cumberland Avenue and a depth of 150 feet. Cumberland Avenue, characterized as a major arterial highway in the master's report, was described by the witnesses as a busy, heavily traveled street. The property is approximately in the center of a square mile bounded by Lawrence Avenue on the north, Irving Park Road on the south, River Road on the west, and Canfield

Avenue on the east. The west half of the square mile is in Chicago, and the northeast half in the Village of Norridge. Cumberland Avenue separates the two municipalities, and the Village of Norridge is across the street to the east of the subject property.

The entire square mile, with few exceptions, is zoned single-family. Most of the southern half consists of forest preserve, zoned R-1 or 2, both classifications allowing single-family residences. The southeast part of the mile is zoned for single-family use, excepting a business district at Irving Park Road. The northeastern quarter-mile, with the exception of business and duplex districts on Lawrence Avenue, is zoned R-1 by Norridge. The northwestern quarter-mile, in which the subject property is located, is primarily R-2, except for a section of R-1, including this property, and a B5-1 general service district at the intersection of Lawrence and Cumberland Avenues.

As to surrounding uses, the subject property is on the eastern boundary of a quarter-mile of land bounded by Cumberland on the east, Lawrence on the north, Montrose on the south and River Road on the west, all in the City of Chicago. The entire quarter-mile is developed for single-family zoning, except for two nonconforming uses. The southern and western portions of the quarter-mile are developed with a subdivision of single-family homes. It contains about 200 homes, and extends for four blocks west of the subject property and several blocks south. There is a shopping center in the B5-1 zone at the northeast corner of the quarter-mile at Lawrence and Cumberland. The southern boundary of the B5-1 zone is 335 feet north of the boundary of the subject property. To the south of the shopping center, partly in B5-1 and partly in R-1, is one of the nonconforming uses, a small hot-dog stand. The remainder of the land between the shopping center and subject property is vacant. The other nonconforming use in the quarter-mile is a wholesale greenhouse located to the west and a little south of the subject property. Immediately to the west and south of this quarter-mile is forest preserve. To the east of the quarter-mile is the Village of Norridge. For a depth of several blocks, including the east side of Cumberland Avenue, the Norridge land is improved by single-family residences. None of the single-family homes face Cumberland, but back up to it. In addition to the single-family homes, there are also several nonconforming uses on the Norridge side of Cumberland Avenue. There are two riding stables, a bowling alley, a single-family home used as a real estate office, and several vacant lots. Multiple-family dwellings nearest to the subject property are located in Norridge, and are several blocks away.

Jerry B. Wack, a real estate appraiser and savings and loan executive, and George H. Kranenberg, a planning and zoning consultant, both testi-

fied for plaintiff that in their opinion the highest and best use of the property was as a multiple-family dwelling. They believed that the property, as zoned, had a market value of $14,000; rezoned as R-4, the property would be valued at $50,000. William A. Alter, the beneficial owner and a real estate developer and broker, testified that the subject property was acquired through trade for another piece of real estate. He did not recall the value of the other property, but the tax stamps on the deed indicated that the subject property was worth $14,500 at the time of purchase. He also testified that plaintiff had been attempting unsuccessfully for some time to sell the property. No "for sale" sign was placed on the premises, but Alter had circulated word of the property's availability among acquaintances in the building business.

Richard J. McKinnon, a city planner, and Donald Crilly, a real estate appraiser and builder, both testified for defendant that the highest and best use of the subject property was as single-family residences. Crilly testified that the value of the surrounding single-residence homes in Chicago ranged from $32,000 to over $40,000; the value of the neighboring Norridge homes ranged from $28,000 to $30,000. He also testified that if plaintiff were granted R-4 zoning, each single-family residence in the area would suffer a reduction of value of two or three thousand dollars per unit because of the increased density. On cross-examination he testified that the decrease in value of the surrounding homes would be based on the number of apartment buildings erected in the area. The first would have little effect, and each would add to the diminution of value.

■■■ In an action to enjoin the enforcement of a zoning ordinance as to a particular property, the moving party faces the burden of proving by clear and convincing evidence that the application of the ordinance is arbitrary and unreasonable, and that it has no substantial relation to the public health, safety and welfare. (*Exchange National Bank of Chicago v. County of Cook*, 25 Ill.2d 434, 185 N.E.2d 250.) The enactment of the ordinance is always presumed to be valid. (*Jacobson v. City of Evanston*, 10 Ill.2d 61, 139 N.E.2d 205.) In order to determine whether the application of the ordinance is arbitrary and unreasonable, the court determines whether "* * * it appears from all the facts that there is room for difference of opinion concerning the reasonableness of the classifications." (*Krom v. City of Elmhurst*, 8 Ill.2d 104, 107, 133 N.E.2d 1.) Where a reasonable difference of opinion exists as to the classifications, the court will without exception acknowledge the existence of the validity of the legislative function of zoning. The courts will not interfere with that legislative function unless the action of the municipality is shown to be arbitrary, capricious, or unrelated to the public health, safety and morals.

(*Wechter v. Board of Appeals,* 3 Ill.2d 13, 119 N.E.2d 747.) The six familiar factors to be considered by a court in determining the validity of zoning were set forth by the Supreme Court in *La Salle National Bank v. County of Cook,* 12 Ill.2d 40, 145 N.E.2d 65.

1) "The existing uses and zoning of nearby property;
2) The extent to which property values are diminished by the particular zoning restrictions;
3) The extent to which the destruction of plaintiff's property values promote the health, safety, morals or general welfare of the public;
4) The relative gain to the public as compared to the hardship imposed on the individual owner;
5) The suitability of the subject property for the zoned purpose;
6) The length of the time the property has been vacant as zoned considered in the context of land development of the area in the vicinity of the subject property."

(In making his report, the master referred to the factors set forth in *La Salle.*)

■■ When the zoning classification of the subject property is viewed under the foregoing criteria and principles of law, we cannot say that the trial court erred in finding that the ordinance was legal, valid and enforceable as to this property. The R-1 zoning of the subject property is in conformity with existing uses and the zoning classification of nearby property. The property is located in an area, although covering two municipalities, which is almost exclusively single-residence. The nearest multiple-family dwellings are in the Village of Norridge, and are located several blocks away from the subject property. The shopping center is located more than 300 feet from the boundary of the subject property. Admittedly, there are several nonconforming uses in the neighborhood: the greenhouse, bowling alley, two riding stables, and hot-dog stand. However, in *Kupsik v. City of Chicago,* 25 Ill.2d 595, 185 N.E.2d 858, the court held that the existence of such uses did not automatically invalidate a zoning ordinance, but that the "impact of those uses upon the area involved is a matter for measurement and appraisal in such case." In our view, the subject property acquires its character from the single-family residences on all sides of it, rather than from the few nonconforming uses in the neighborhood. Moreover, even if we were to find that, by reason of these nearby commercial uses, the subject property was inappropriate as single-family residences, we do not believe that it would be more appropriate for multi-family purposes.

■■ *Gable v. The Village of Hinsdale,* 87 Ill.App.2d 123, 230 N.E.2d 706, cited by plaintiff in support of its proposition, is distinguishable from the case at bar. In that case, the court, in holding that the zoning

classification of the property in question was unreasonable by virtue of nearby nonconforming uses, found that such uses exceeded fifty per cent of the neighborhood. No such excessive number of nonconforming uses exists in the instant case. *Forbes v. Hubbard,* 348 Ill. 166, 180 N.E. 767, is also distinguishable. In *Forbes,* the court held that plaintiff's property took its character from the developed commercial property across the street in another municipality. The thrust of the case was that property on one side of a heavily traveled street dividing two municipalities could take its character for zoning purposes from the commercial property across the street in the other municipality rather than from the residential property behind it. In the instant case, however, while there are commercial uses on the east side of Cumberland Avenue in Norridge, there are also single-family homes on that street.

■■ Admittedly, plaintiff is sustaining a decided economic loss by virtue of its inability to effectuate a change in the zoning classification of the subject property. However, in *Seith v. City of Wheaton,* 89 Ill.App. 2d 446, 451, 232 N.E.2d 173, the court used language appropriate to the instant case:

> "The can be little doubt here that the surrounding area is predominantly residential in character and that this has been a long established classification of use and that the subject property is not inappropriate for such use. The fact that plaintiffs' property might be worth more if more intensive use were permitted is true in most every case when use of private property is restricted by zoning ordinances. This is not of itself sufficient to invalidate the ordinance."

We note also that defendant adduced evidence that each single-family property owner would suffer a substantial financial loss if multi-family dwellings were introduced into the neighborhood.

■■ Plaintiff also argues that the erection of two single-family residences on the subject property would constitute a danger to its residents on the subject property would constitute a danger to its residents and would be hazardous to the public. It bases this contention on the fact that Cumberland is a heavily traveled street and because the homes necessarily would have to face Cumberland. Plaintiff points out, in this regard, that if permitted to erect an apartment building, it would construct a turnaround area in the rear for automobile exit. Such a facility would appear to be just as feasible if two single-family residences were built. And we are not persuaded that traffic on Cumberland Avenue would be less detrimental to a multiple-family dwelling than to the single-family residences.

■■ Under the facts and circumstances of the instant case, we do not believe that the length of time the subject property has been vacant is a

significant factor in determining the validity of the ordinance. This is so in view of plaintiff's limited efforts to dispose of the property.

■■ Finally, plaintiff maintains that the trial court failed to follow established law in overruling the report and recommendations of the master-in-chancery. It particularly notes that the trial judge observed that if plaintiff were to erect an apartment building on the property, more developers would attempt to follow suit on neighboring land, and such developments would substantially change the character of the neighborhood. There is support in the law for the judge's observation. (See *Elmhurst National Bank v. City of Chicago,* 22 Ill.2d 396, 176 N.E.2d 771.) However, the record clearly reflects that plaintiff's failure to maintain its burden of proving the invalidity of the ordinance was the basis compelling the judge to overrule the findings and recommendations of the master. The decree recited that the court received and considered the master's report, defendant's objections thereto, the pleadings, exhibits and transcript of proceedings. The decree concluded that plaintiff failed to prove the allegations of the complaint. We cannot say. that the trial judge erred in making such a determination.

Decree affirmed.

McGLOON, P. J., and DEMPSEY, J., concur.